**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JONATHAN W. CHUDSON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 14-231 (RDM)** |
| ) | |
| **MELVIN L. WATT,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Jonathan Chudson, acting *pro se*, brings this employment discrimination suit against the Director of the Federal Housing Finance Agency ("the FHFA" or "the Agency") in his official capacity, alleging violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* In 2011, Plaintiff unsuccessfully applied for four positions advertised by the FHFA. He alleges that the FHFA discriminated against him on the basis of age when it failed to hire him for these positions and that it "used a scheme to avoid hiring older qualified veterans." Dkt. 1 ¶ 6. He seeks monetary damages and other relief. Dkt. 1 at 8.

Pending before the Court is the FHFA's motion to dismiss, or in the alternative, for summary judgment (Dkt. 6) and Plaintiff's motions for leave to file surreplies (Dkts. 12, 13). As explained below, the FHFA has demonstrated that it is entitled to summary judgment with respect to three of the positions at issue, but not the fourth. Accordingly, the FHFA's motion to dismiss or, in the alternative, for summary judgment (Dkt. 6) is **GRANTED** in part and **DENIED** in part. Plaintiff's motions for leave to file surreplies (Dkts. 12, 13) are **GRANTED**.

# I. BACKGROUND

Plaintiff is an honorably-discharged veteran who is over 40 years of age.  *See* Dkt. 6-1 ¶¶ 15, 16.[1]  He has previously worked for several government agencies, including the Environmental Protection Agency ("EPA"), where his duties included criminal investigative activities.  *See id.* at ¶¶ 17-23.

In 2011, Plaintiff submitted applications in response to four vacancy announcements for positions with the FHFA Office of Inspector General ("FHFA-OIG").  They included two "Investigative Evaluator" positions, advertised under vacancy announcements 11-FHFAIG-086DH and 11-FHFAIG-108DH, and two "Criminal Investigator-Special Agent" positions, advertised under vacancy announcements 11-FHFAIG-112DH and 11-FHFAIG-090.  *See* Dkt. 6-1 ¶¶ 24-37.  Three of the vacancies (11-FHFAIG-086DH, 11-FHFAIG-108DH, 11-FHFAIG-112DH) were advertised pursuant to temporary direct-hire authority granted to the FHFA-OIG by the Office of Personnel Management ("OPM").  Dkt. 6-1 ¶¶ 4-14, 24, 28, 32, 36.  According to OPM guidance, direct-hire authority allows an agency to bypass certain procedures that hiring agencies would otherwise be required to follow.  *See* Dkt. 6-1 ¶¶ 4-14; Dkt. 6-3 at 9.  The vacancy announcements issued under this direct-hire authority stated that "[c]ompetitive examining rules regarding [the] rating and ranking, and veterans' preference do not apply."  *See* Dkt. 6-4 at 2; Dkt. 6-5 at 4; Dkt. 6-5 at 9.  The fourth vacancy (11-FHFAIG-90) was advertised without relying on direct-hire authority.

---

[1]  Except where noted, the facts in this section are taken from Defendant's Statement of Material Facts Not In Genuine Dispute (Dkt. 6-1).  Although cautioned that uncontested affidavits and other sworn statements may be accepted as true for purposes of resolving the pending motion, *see Fox*/*Neal* Order, Dkt. 7, Plaintiff has either expressly declined to dispute the relevant facts, *see* Dkt. 13 at 1, or has failed to dispute them and has thereby conceded them, *see* Local Civil Rule 7(h).

Plaintiff was not interviewed or selected for any of the four positions.  *See* Dkt. 6-1 ¶¶ 26, 30, 33, 37.  The two Special Agent positions were filled.  *See* Dkt. 6-1 ¶¶ 35, 39.  Two individuals were offered positions that would have filled the first Investigative Evaluator position, but "one selectee declined the Agency's offer," and the offer to the other selectee was rescinded "after the parties could not agree on the selectee's starting pay grade and compensation level."  *See* Dkt. 6-4, at 11 ¶ 17; *see also* Dkt. 6-2 at 15-16.  No one was interviewed or hired for the second Investigative Evaluator position.  *See* Dkt. 6-7 at 11.

With respect to the first of the two Special Agent positions, Special Agent-in-Charge Peter Emerzian and Special Agent-in-Charge Paul Conlon "reviewed the resumes for all applicants whose names appeared on the minimally qualified list."  Dkt. 6-5 at 17.  According to Emerzian, they agreed that one applicant, Stuart Carlisle, was in their view "the very best candidate" for the "position based on his decades of work as a criminal investigator, including years of sophisticated financial investigative experience acquired while working for the Federal Bureau of Investigation" ("FBI").  *Id.*  According to Conlon, he was impressed by Carlisle's "very strong experience with white collar . . . crime" and his "long career with multiple assignments dealing with criminal matters."[2]  Dkt. 6-8 at 15.  They interviewed Carlisle, and no other candidate, for this position.  Dkt. 6-5 at 18.  After seeking references for Carlisle, Emerzian and "other panel members," *see* Dkt. 6-6 at 6, recommended Carlisle to the deciding official, Deputy Inspector General for the FHFA-OIG Christopher Sharpley.  Dkt. 6-5 at 17-19.  Sharpley then selected Carlisle for the position.  Dkt. 6-6 at 6.

---

[2]  Conlon also stated that Carlisle's application stood out because unlike many of his FBI peers, Carlisle did not switch over to handling counter-terrorism cases after the September 11, 2011, attacks on the United States.  Dkt. 6-8 at 15.  That conclusion appears to have been mistaken at least in part; from 2003 to 2007 Carlisle supervised units that did "[t]he majority" of their work on "counter-terrorism and counter-intelligence cases."  *See* Dkt. 6-7 at 16.

Unlike the first Special Agent position, the second one was not advertised using the office's temporary direct hire authority. *See* Dkt. 6-6 at 13. Emerzian again served as the recommending official, this time with the assistance of Special Agent Guy Petrillo. Dkt. 6-6 at 9. Emerzian worked off of the "best qualified list" ("BQL"), and does not recall whether Plaintiff was on that list. Dkt. 6-5 at 20. The record, however, suggests that Plaintiff "did not make" that list. *See* Dkt. 6-6 at 8. Although the FHFA is not as clear about this as it might have been, it seems safe to assume that if Plaintiff "did not make" the BQL, it was because others were deemed more qualified. And, as Emerzian asserts, if Plaintiff was on the list, the only reason he would not have been interviewed "would have been because after reviewing all of the BQL candidates' applications, there was someone I thought was a much better fit for the position." *Id.* That person, in Emerzian's view, was Karen Briscoe, who he describes as "a seasoned Criminal Investigator from the Internal Revenue Service ("IRS") with years of experience investigating complex financial crimes." *Id.* According to Emerzian, Briscoe's application also stood out because she is an attorney, and she had already spent several months on detail from the IRS to [the] FHFA-OIG to help get the Inspector General's "newly-created Office of Investigations on its feet." *Id.* As a result, Emerzian had first-hand knowledge of Ms. Briscoe's abilities, and he concluded that she is "highly intelligent, very hard-working, and deeply experienced in the types of investigations [the] FHFA-OIG was undertaking." *Id.* at 20-21. Emerzian, accordingly, recommended to Sharpley, who was again the deciding official, that the Agency hire Briscoe. *Id.* at 21. Based on this recommendation, Briscoe was selected for the position. Dkt. 6-6 at 9-10.

The hiring process for the two Investigative Evaluator positions differed from the process used for the Special Agent positions. Plaintiff applied for both Investigative Evaluator positions,

and, as to both positions, his name was placed on the "minimally qualified list[s]," which identified "every applicant who met certain very basic requirements." Dkt. 6-7 at 5, 10. As to the first position, the Acting Deputy Inspector General for Evaluations, Richard Parker, was the selecting official. Dkt. 6-7 at 7. There was no formal recommending official for the position, although others at the FHFA informally "recommended three individuals" to Parker. Dkt. 6-7 at 6-7; Dkt. 6-4 at 11 ¶ 15. Parker interviewed "the three applicants whom colleagues had referred or recommended" and did not interview any other applicants. Dkt. 6-7 at 6. After interviewing Joanne Legomsky, he decided to offer her the first of the two Investigative Evaluator positions. *Id.* at 7. He explained that he offered the position to Legomsky "because she had substantial experience with complex financial investigations, as well as considerable expertise with the financial markets in which [the regulated entities] play a central role." *Id.* at 7-8. Although Legomsky initially accepted the offer, she and the Agency were unable to reach an agreement on compensation, and the FHFA "ultimately rescinded its offer." *Id.*

Parker then offered the position to William Shen. *Id*. at 7-8. Although it appears that Shen lacked the substantial investigative experience possessed by Legomsky, he had "substantial high-level experience in housing, residential real estate finance, mortgage-backed securities and capital markets." *Id.* at 8. Shen, however, declined the offer of employment. *Id.* at 7.

After that, Parker turned his attention to other matters and did not make any further offers to fill the first Investigative Evaluator position. Rather, as he explains at length in his declaration, Parker devoted his time to completing the Inspector General's first Semiannual Report ("SAR") to Congress. *See* Dkt. 6-4 at 8-17, ¶¶ 7-11, 18-20, 25-26. Parker asserts that "production of a SAR is extremely labor-intensive" and "that several hundred hours of work are typically involved in producing a SAR." Dkt. 6-4 at 10 ¶ 8. "As one of the Agency's few

supervisors in the Spring of 2011," Parker states that his work on "the SAR consumed an increasingly significant portion of [his] workload as the Agency approached its late May 2011 publishing deadline." *Id.* at 10 ¶ 10. He asserts that he never made a decision not to fill the first position, but that he "had to focus on other more critical work priorities to 'stay afloat'" and that filling the position "was simply overcome by events." *Id.* at 12 ¶ 19.

With respect to the second Investigative Evaluator position, even less progress was made. Although the position was advertised and Plaintiff, among others, was included on the minimally qualified applicant list, Dkt. 6-7 at 10, none of Parker's "agency colleagues made recommendations to" him, Dkt. 6-4 at 13 ¶ 24, no interviews were conducted, Dkt. 6-7 at 11, and no selections or offers were made for the position, *id.* Again, Parker points to the other demands on his time in the Spring of 2011 to explain why the position was left unfilled, Dkt. 6-4 at 13 ¶¶ 25-26, and, again, he asserts that his hiring efforts were "simply overcome by events," *id.* at 13.

In the end, Plaintiff was never interviewed for any of the four positions and was not offered any of the jobs. On September 28, 2011, he filed an administrative complaint alleging that the FHFA had discriminated against him based on age and disability. *See* Dkt. 1 ¶ 8; *see also* Dkt. 6-8 at 19. The Administrative Judge granted summary judgment in favor of the Agency without a hearing and dismissed Plaintiff's claims. *See* Dkt. 1-2. In November 2013, Plaintiff received a right to sue letter from the FHFA, *see* Dkt. 1-2, and, on February 18, 2014, he brought this suit "pursuant to the [ADEA] for employment discrimination on the basis of age." Dkt. 1 ¶ 3 (citation omitted). Defendant has now moved to dismiss or, in the alternative, for summary judgment. *See* Dkt. 6. Plaintiff filed a response to the Agency's motion (Dkt. 8) and moved for leave to file two surreplies (Dkts. 12, 13).

## II.  LEGAL STANDARD

The FHFA has moved to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure or, in the alternative, for summary judgment under Rule 56.  *See* Dkt. 6 at 1.  As both parties rely on documents not attached to or incorporated by reference into the complaint, the Court rules on Defendant's motion for summary judgment.  *See* Fed. R. Civ. P. 12(b); *Armstead v. Jewell*, 958 F. Supp. 2d 242, 245 (D.D.C. 2013).

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Liberty Lobby*, 477 U.S. at 248).  When considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Liberty Lobby*, 477 U.S. at 248; *see also Shekoyan v. Sibley Int'l*, 409 F.3d 414, 422-23 (D.C. Cir. 2005) (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000)).

## III.  ANALYSIS

Because Plaintiff has asserted an ADEA claim based on indirect evidence of discrimination, the Court applies the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Chappell-Johnson v. Parnell*, 440 F.3d 484, 487 (D.C. Cir. 2006); *Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1077 (D.C. Cir. 1999).  Under this framework, a plaintiff is first required to establish a prima facie case of discrimination.  *See id.*; *Aka v.*

*Washington Hosp. Ctr.*, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).  The burden then shifts

to the defendant employer to show that "the plaintiff was rejected, or someone else was

preferred, for a legitimate, nondiscriminatory reason."  *Reeves*, 530 U.S. at 142 (quotation marks

omitted).  At that point, "the question on summary judgment becomes whether, based on the

totality of the parties' evidence, a reasonable jury could determine that the defendant's proffered

explanation was pretext for discrimination."  *Kilby-Robb v. Duncan*, 77 F. Supp. 3d 164, 169

(D.D.C. 2015) (citing *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494-95, (D.C. Cir.

2008)).  "[T]o survive summary judgment the plaintiff must show that a reasonable jury could

conclude from all of the evidence that the adverse employment decision was made for a

discriminatory reason."  *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003).

     The FHFA argues that it did not interview or hire Plaintiff for a legitimate, non-

discriminatory reason—that is, "he simply does not have the qualifications to serve as an

Investigative Evaluator or a Special Agent."  Dkt. 6-2 at 1.  It further contends that the applicants

who were selected for the positions possessed qualifications that Plaintiff does not have.  And,

with respect to the two Investigatory Evaluator positions, the FHFA further explains that the

selecting official was too busy to finish filling those positions and did not have a discriminatory

motive for leaving them unfilled.

     Plaintiff argues that he is qualified for all four of the FHFA-OIG positions.  Pointing to

alleged inconsistencies in the accounts given by Parker and the other hiring officials, as well as

to alleged deficiencies in the hiring process, he argues that the FHFA's explanation for failing to

hire him is pretextual.  As explained below, the Court concludes that for three of the positions—

the two Special Agent positions and the second of the two Investigative Evaluator positions—no

reasonable jury could infer from all the evidence that the FHFA discriminated against Plaintiff

on the basis of age. *See Lathram*, 336 F.3d at 1088.  As to the first of the two Investigative

Evaluator positions, however, the Court concludes that the record, in its current state, does not

support entry of summary judgment.  Finally, to the extent Plaintiff also argues that the Agency

engaged in systemic practices that discriminated against older veterans or failed to give him

preference as a veteran, the Court concludes that Plaintiff has failed to state a claim.

The Court first addresses the two Special Agent positions, then turns to the two

Investigative Evaluator positions, and finally addresses any remaining issues raised by Plaintiff's

contention that the FHFA used its temporary, direct hire authority in a manner resulting in

systemic discrimination.

## A.  Special Agent Positions

With respect to the two Special Agent positions, the FHFA's uncontested declarations

and affidavits state that Agency personnel reviewed the qualified or best qualified applications

and hired the two candidates that the recommending and selecting officials concluded were most

qualified.  *See* Dkt. 6-5 at 17-18, 20-21; Dkt. 6-6 at 9-10.  Both positions were filled by

candidates with substantial, relevant experience.  *See id.*; *see also* 6-7 at 15-18.  The question,

then, is whether this showing is sufficient under the *McDonnell Douglas* framework and whether

a reasonable juror might conclude that the Agency's decisions were "made for a discriminatory

reason."  *Lathram,* 336 F.3d at 1088.

As the Court of Appeals has observed, where, as here, "an employer says it made a hiring

decision based on the relative qualifications of the candidates, '[the court] must assume that a

reasonable juror who might disagree with the employer's decision, but would find the question

close, would not usually infer discrimination on the basis of a comparison of qualifications

alone.'"  *Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007) (quoting *Aka v. Wash. Hosp.*

*Ctr.*, 156 F.3d at 1294). "On the other hand, if a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture." *Id.* (quotation marks omitted). The plaintiff may also "expose other flaws in the employer's explanation, including, inter alia, showing the employer has misstated her qualifications," *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006), or "present[] other evidence, direct or circumstantial, that permits an inference of discrimination," *id.* at 899.

The FHFA argues, and Plaintiff does not dispute, that it sought to hire applicants with specialized skills, knowledge, and experience. The FHFA-OIG monitors housing markets, conducts oversight of government-sponsored entities such as Fannie Mae and Freddie Mac, and investigates financial crimes. *See* Dkt. 6-2 at 3, 14, 17. The FHFA argues that, accordingly, it sought Special Agent candidates that possess "specialized experience using various investigative techniques," and experience "investigating . . . bank, securities, and mortgage fraud, and other various white-collar crimes." *See* Dkt. 6-2 at 17. The Agency's description of the desired qualifications is consistent with the qualifications stated in the relevant vacancy announcements, *see* Dks. 6-5 at 9-11; Dkt. 6-6 at 13-16, and with the accounts of the recommending and selecting officials, *see* Dkt. 6-5 at 17-18, 20-21 (Affidavit of Peter Emerzian), Dkt. 6-6 at 5-6, 9-10 (Affidavit of Christopher Sharpley).

The Agency argues that Plaintiff's qualifications for the Special Agent positions were "vastly inferior" to those of the two candidates who were hired because he "ha[d] no recent criminal investigative experience" and "ha[d] not performed any criminal investigative activities

whatsoever since October 1990," when he left a management position at EPA.  *See* Dkt. 6-2 at 6, 20; Dkt. 6-1 ¶¶ 21-23.  During his deposition in the administrative proceeding, Plaintiff conceded that "conducting investigations was a small part of" the position he held at the EPA, where he was "a manager."  Dkt. 6-3 at 25.  He explained, "[a]s a desk officer, I reviewed the work, I reviewed investigations, and did planning, that sort of thing.  And it was rare that I would do the actual investigation."  *Id.*  Plaintiff does not appear to dispute that the EPA position, which he left more than two decades before applying for the FHFA-OIG positions, *see* Dkt. 6-8 at 3, represents his most recent criminal investigation experience or that conducting actual criminal investigations was a relatively small part of that work.  *See* Dkt. 13 at 2-3; Dkt. 8 at 1-2; Dkt. 12 at 3.  Prior to working at the EPA's Office of the Inspector General, Plaintiff worked for the Offices of Inspectors General at the General Services Administration and Department of Transportation, where he participated in fraud investigations.  Dkt. 6-8 at 2-7.  Those experiences, however, date back to 1984 and 1982-1984, respectively.  *Id.* at 4-5.  And, finally, Plaintiff gained additional investigative experience working at the Internal Revenue Service in the 1970s, but, again, this experience was substantially out of date.  *Id.* at 6-7.

In contrast, the first individual selected for the Special Agent positions possessed over twenty-five years of experience as an FBI agent, including extensive experience investigating fraud.  *See* Dkt. 6-2 at 18; Dkt. 6-5 at 17; Dkt. 6-7 at 15-18.  That applicant's FBI investigation experience, moreover, was considerably more recent than Plaintiff's, extending until 2007.  Dkt. 6-7 at 16.  After leaving the FBI in 2007, moreover, the applicant served for approximately sixteen months as a regional security manager for a bank and oversaw fraud and theft investigations.  *Id.* at 15.  The second successful applicant was "a seasoned Criminal Investigator with the Internal Revenue Service ("IRS") with years of experience investigating complex

financial crimes." Dkt. 6-5 at 20; Dkt. 6-2 at 19.  She also possessed a law degree.  *Id.*  And she stood out because she had spent several months on detail from the IRS to the FHFA-OIG and had already proven herself to be "highly intelligent, very hard-working, and deeply experienced in the types of investigations FHFA-OIG was undertaking."  Dkt. 6-5 at 20-21.

In response, Plaintiff argues that the Agency should have concluded that he was qualified based on other credentials.  He argues that "he served as desk officer for two of the five divisional investigations offices" at EPA and performed numerous investigative activities in that position, *see* Dkt. 13 at 2-3; he "previously served as a Special Agent for several federal agencies and did so with distinction," Dkt. 8 at 1; *see also* Dkt. 12 at 3; Dkt. 13 at 2-3; he graduated first in his class at the Federal Law Enforcement Training Center's Criminal Investigator School, *see* Dkt. 12 at 3; and he received an award from the Department of Transportation, *id.*; *see also* Dkt. 6-8 at 1-9 (Plaintiff's resume).

"'[I]t is the perception of the decision maker," however, "which is relevant, not the self-assessment of the plaintiff.'"  *Hairston v. Vance-Cooks*, 773 F.3d 266, 273 (D.C. Cir. 2014) (quoting *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011)).  Here, the Agency has explained that Plaintiff's management position at EPA did not provide the criminal investigative experience sought by the hiring officials, and the other credentials cited by Plaintiff do not establish that he had the most relevant experience.  Plaintiff argues that he received email notifications from OPM indicating that Plaintiff was "eligible" for three of the four FHFA-OIG positions, *see* Dkt. 12 at 5; Dkt. 8-1 at 2, 3, and 5.  But an employer is not required to make a hiring decision based on "a mechanistic checkoff of qualifications required by the written job descriptions."  *See Aka*, 156 F.3d at 1297 n.15.  The OPM emails merely document the preliminary determination that Plaintiff possessed the minimal qualifications necessary to be

eligible for further consideration by the hiring agency.  The emails do not support an inference

that he was as qualified as the successful applicants for the two Special Agent positions.

     In any event, even if Plaintiff could demonstrate that his qualifications were comparable

to those of the applicants selected by the FHFA, it would not suffice to avoid summary

judgment.  "In order to justify an inference of discrimination, the qualifications gap [between the

plaintiff and the selected candidate] must be great enough to be inherently indicative of

discrimination."  *Holcomb*, 433 F.3d at 897.  In general, this means that a jury would need to be

able to conclude that a reasonable employer would have found Plaintiff "*significantly* better

qualified for the job."  *Id.* (emphasis in original); *see also Jackson*, 496 F.3d at 707 (holding that

an inference of discrimination is not supported if a jury comparing the individuals' relative

qualifications "would find the question close").  A reviewing court does not "serve as a super-

personnel department" that second-guesses an employer's choice among qualified candidates.

*Holcomb*, 433 F.3d at 897; *see also Fischbach v. District of Columbia Dep't of Corrections*, 86

F.3d 1180, 1183 (D.C. Cir. 1996) ("[T]he court must respect the employer's unfettered discretion

to choose among qualified candidates.").  Although Plaintiff has impressive credentials, he has

not pointed to any evidence indicating that he was as qualified as the applicants who were

selected, much less "*significantly* better qualified," *Holcomb*, 433 F.3d at 897, for the two

Special Agent positions at issue.  As a result, there is insufficient evidence for a reasonable jury

to infer from the applicants' comparative qualifications that the FHFA's decision to hire the

other candidates for the Special Agent positions was discriminatory.

     A plaintiff may also oppose a motion for summary judgment by demonstrating that "the

employer's explanation misstates the candidates' qualifications."  *Aka*, 156 F.3d at 1295; *see*

*also Holcomb*, 433 F.3d at 897.  For example, "if the employer says that it did not hire the

plaintiff because he did not speak Portuguese, [and] the plaintiff can show that he *did* speak Portuguese, and that the employer knew it," that "may suffice to permit a jury to infer that the employer's explanation is incorrect or fabricated, and thus to infer discrimination." *Aka*, 156 F.3d at 1295 (emphasis in original). But Plaintiff has identified no such inaccuracies here; he merely disagrees with the FHFA's assessment of his qualifications. That is not enough to create a dispute of material fact. *See Hairston*, 773 F.3d at 273; *Williams v. Shinseki*, 967 F. Supp. 2d 95, 105 (D.D.C. 2013).

Plaintiff also alleges that several agency officials falsely represented that they were unaware of the applicants' ages or "ha[d] no direct knowledge" of their ages. *See* Dkt. 1 ¶ 6. Plaintiff argues that this testimony is false because the officials must have been aware of the applicants' "approximate age[s]" based on personal interactions or review of their applications, *see* Dkt. 1 ¶ 6, and he apparently asks that the Court infer that this "false" testimony constitutes direct evidence of discriminatory intent or evidence that the proffered justifications were pretextual. The argument fails, however, because it misstates the contents of the affidavits. One official stated, for example, that he had "no direct knowledge" of the ages of the applicants he interviewed and hired, but then proceeded to estimate their approximate ages. *See* Dkt. 6-5 at 18-19 (Emerzian Aff.) ("I . . . had a basic impression of his age (somewhere in his 50s)"); *id*. at 21 ("I don't know her age, but from firsthand observation I would place her somewhere in her late 30s."). The possibility that one might make an educated guess regarding someone's age is not by any means incompatible with the statement that he or she is "unaware of" or lacks "direct knowledge" of that person's age.

Nor has Plaintiff shown that defects in the hiring process and administrative proceeding, if any, might reasonably support an inference that the Agency's asserted rationales for hiring the

two successful applicants for the Special Agent positions were pretextual.  As the Court of Appeals has emphasized, "[s]howing pretext . . . requires more than simply criticizing the employer's decisionmaking process."  *Hairston*, 773 F.3d at 272.  Here, Plaintiff argues that the Agency only interviewed one applicant for each of the Special Agent positions before filling those positions.  *See* Dkt. 1 ¶ 6.  Plaintiff's view that the Agency did not interview enough candidates is not, standing alone, evidence of pretext.  If he is arguing that making a hiring decision based on a limited number of interviews is suggestive of discrimination, he does not cite any supporting authority.  To the contrary, the Court of Appeals has observed that "[s]electing a pool of qualified candidates based upon their written credentials and then making a final selection based upon personal interviews is an obviously reasonable method of hiring a professional employee."  *Fischbach*, 86 F.3d at 1183-84.  Plaintiff also argues that the younger of these two successful applicants for the Special Agent position received an interview because she was personally known to the hiring officials on the basis of her work as a detailee.  *See* Dkt. 1 ¶ 6, *see also* Dkt. 6-5 at 20.  That contention, however, says nothing about the dispositive question, which is whether, drawing all inferences in Plaintiff's favor, a jury might reasonably conclude that the FHFA's decision to hire her, and not Plaintiff, was the product of age discrimination.

Finally, the Court notes an issue that is not discussed by either of the parties, but that warrants mention.  The job announcements for the two Special Agent positions included an express "Age Restriction."  *See* Dkt. 6-5 at 10 ("The date immediately preceding an individual's 37th birthday is the maximum entry age for original appointment to a position within the OIG as a law enforcement officer."); Dkt. 6-6 at 14 (similar).  The announcements further state that the age restrictions are inapplicable to preference-eligible veterans or to individuals previously

covered under a special law enforcement retirement plan.  *See id.*

Congress has "expressly authorize[d] agencies to set age requirement for appointment to law enforcement positions."  *Stewart v. Smith*, 673 F.2d 485, 490 (D.C. Cir. 1982); *see* 5 U.S.C. §§ 3307(d), (e).  The Court of Appeals has explained that "Congress meant . . . to provide for maximum age requirements for law enforcement officers on the theory that these jobs involve special concerns that require consideration of factors not ordinarily accounted for in the ADEA's independent scheme for evaluating age restrictions."  *Stewart*, 673 F.2d at 492.  Accordingly, Congress created a limited "exception to the ADEA" allowing the use of age restrictions in hiring for certain law enforcement positions.  *Id.* at 492-94; *see also Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 69 (2000); *Miller v. Clinton*, 687 F.3d 1332, 1339 (D.C. Cir. 2012).

Neither party contends that the age restrictions in the Special Agent position announcements played any role in the FHFA's failure to select Plaintiff.  The Agency does not invoke the age restrictions as a legitimate non-discriminatory reason for its decisions to hire persons other than Plaintiff, the hiring officials do not mention the restrictions, and it is unclear from the record what role, if any, the restrictions played in the Agency's hiring process.  One of the individuals hired as a Special Agent was apparently in his fifties, *see* Dkt. 6-5 at 18-19, although that individual may have been exempt as a qualified former law enforcement officer, *see* Dkt. 6-5 at 10; Dkt. 6-7 at 15-18.  Similarly, Plaintiff may have been exempt as a "preference-eligible veteran," *see* Dkt. 6-5 at 10; Dkt. 6-6 at 14.

In any event, Plaintiff does not suggest that the age restrictions in the announcements were legally improper.[3]  He does not argue, for example, that the FHFA-OIG Special Agent

---

[3]  In connection with Plaintiff's allegation that the Agency used its direct-hire authority to discriminate against older veterans, *see* Dkt. 1 ¶ 6, the complaint cites a Merit Systems Protection Board decision requiring agencies to waive non-essential age restrictions for eligible

positions are not the type of law enforcement positions subject to age restrictions.  Nor does he

argue that the age restrictions were improperly applied to him.  In light of the legislative

authorization for at least certain age restrictions, Plaintiff's failure to challenge (or even mention)

the restrictions in any of his briefs, and the lack of evidence that the restrictions formed a basis

for the Agency's decision, the Court cannot conclude that they give rise to any dispute of

material fact.

## B.  Investigative Evaluator Positions

Applying the *McDonnell Douglas* framework to the two Investigative Evaluator positions

raises a distinct set of issues.  As with the Special Agent positions, the Agency argues that

Plaintiff "simply does not have the qualifications to serve as an Investigative Evaluator."  Dkt. 6-

2 at 1; *see also* Dkt. 11 at 3 n.3 ("[T]he [A]gency did not select Plaintiff for" the first

Investigative Evaluator position or the two Special Agent positions "because he possesses vastly

inferior qualifications.").  With respect to the Special Agent positions, as discussed above, *see*

*supra* at 4, 9-13, it appears that Plaintiff's applications were considered and evaluated in light of

his comparative qualifications.  With respect to the Investigative Evaluator positions, in contrast,

there is no evidence that anyone actually weighed Plaintiff's qualifications against those of other

applicants.  *See* Dkts. 6-4 at 8-17; Dkt. 6-7 at 1-14.  The record indicates that Plaintiff's name

was placed on the "minimally qualified list[s]," which identified "every applicant who met

certain very basic requirements" for the positions, *see* Dkt. 6-7 at 5, 10, but Parker appears to

have only considered three individuals informally referred or recommended to him, *see* Dkt. 6-7

---

veterans, *see Isabella v. Dep't of State*, 109 M.S.P.R. 453, 457-461 (M.S.P.B. 2008); Dkt. 8 at 3.
*Isabella*, however, involved a claim under the Veterans Employment Opportunities Act, not a
claim under the ADEA.  109 M.S.P.R. at 455.  Plaintiff's passing citations to *Isabella*, absent
some explanation linking that decision to his ADEA claim and the facts of this case, are
insufficient to raise an issue based on the age restrictions in the position announcements.

at 6-7; Dkt. 6-4 at 11 ¶¶ 15-16.  Accordingly, it is unclear whether or how Parker could have concluded that Plaintiff was less qualified than the two individuals offered the first Investigative Evaluator position.  Although the Agency has offered after-the-fact conclusions about Plaintiff's relative merits, the record contains no indication whether Plaintiff's application was ever considered, much less evaluated in relation to the qualifications of other applicants.

Against this backdrop, resolution of the Agency's motion for summary judgment turns on who bears the burden of proof at this stage of the proceeding.  Under the *McDonnell Douglas* framework, it is Plaintiff's initial burden to demonstrate that he was qualified for the position.  At one time, a question might have existed whether evidence of "minimal qualification" was sufficient to meet a plaintiff's initial burden or whether a plaintiff must show at the outset that he or she is as qualified, or more qualified, than the selectee.  In a footnote in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358 n.44 (1977), the Supreme Court wrote that to make out a prima facie case of discrimination the plaintiff must "demonstrate at least that his rejection did not result from . . . an absolute *or relative lack of qualifications*," *id.* (emphasis added).  Based on this language, some courts concluded that to make out a prima facie case, a plaintiff needed to show that he or she was, "in comparison to the person selected, . . . as well (or better) qualified."  *Mitchell v. Baldridge*, 759 F.2d 80, 85-86 (D.C. Cir. 1985).

The Court of Appeals, however, put this issue to rest in *Mitchell v. Baldridge*, *id*., holding that "we read the somewhat delphic *Teamsters* footnote as contemplating qualifications relative to the entire pool from which applications are welcome, rather than qualifications relative only to those eventually selected," *id.*  On this basis, the Court of Appeals held that the district court erred by requiring a plaintiff to demonstrate that he "is or was at least as qualified as the person chosen for the position" as part of the prima facie case.  *Id.* at 84 (quotation marks omitted); *see*

*also Cones v. Shalala*, 199 F.3d 512, 518 (D.C. Cir. 2000) ("for purposes of the prima facie

case, . . . it is sufficient that [the plaintiff] has established that he was substantively qualified.").

      Here, it is undisputed that Plaintiff possesses many years of professional experience

related to investigations and accounting.  *See* Dkt. 6-8 at 1-9.  It is also undisputed that he was

placed on the "minimally qualified" list for both of the Investigative Evaluator positions.  *See*

Dkt. 6-7 at 5, 10.  Presumably for these reasons, the FHFA does not argue that Plaintiff has failed

to carry his initial burden of establishing a prima facie case.  Given the relevant evidence and the

FHFA's failure to contest the issue, the Court concludes that it need not inquire further into the

adequacy of Plaintiff's prima facie showing.  *See Brady*, 520 F.3d at 493-94.

      At this point, the burden of production shifts to the Agency to come forward with

"admissible evidence that, if believed, would establish that the employer's action was motivated

by a legitimate, nondiscriminatory reason."  *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139,

1151 (D.C. Cir. 2004); *see also Reeves*, 530 U.S. at 142.  To meet this burden, the FHFA offers

two possible rationales:  (1) that Plaintiff was less qualified than the applicants who were offered

the first Investigative Evaluator position, and (2) that Parker was overwhelmed with other work

and failed to fill either of the two Investigative Evaluator positions because that task "was simply

overcome by events."  Dkt. 6-4 at 12 ¶ 19, 14 ¶ 26.  The Court considers, in turn, how these

rationales apply to each of the two Investigative Evaluator positions.

      **1.**   *The Relative Qualifications Rationale*

      The FHFA contends that the two selectees for the first Investigative Evaluator position

were chosen over Plaintiff because Plaintiff's qualifications were "vastly inferior."  *See* Dkt. 11

at 3 n.3; *see also* Dkt. 6-2 at 1.  Because the Agency never interviewed any candidate for the

second of the two positions, it relies on this rationale only with respect to the first position.  But,

even as to that position, this explanation is not supported by the evidence currently before the Court. According to the Parker declaration and affidavit, he interviewed three candidates informally referred to him by colleagues and extended offers to two of those individuals. *See* Dkt. 6-7 at 6-7; Dkt. 6-4 at 11 ¶¶ 15-17. He did not attest that he selected those three individuals over the other candidates based on a comparison of relative qualifications. Indeed, there is no indication that Parker—or anyone else—even reviewed the other applications. The Parker affidavit does cite the selectees' qualifications, *see* Dkt. 6-7 at 7-8, but he does so to explain his choice to extend offers to two of the three individuals he interviewed—not to explain why he failed to interview Plaintiff.

In the ordinary course, an employer need only "explain[ ] clearly the nondiscriminatory reasons for its actions," *Texas Dept. Comm'y Affairs v. Burdine*, 450 U.S. 248, 260 (1981), and a court will "respect an employer's . . . discretion to choose among qualified candidates," *Fischbach*, 86 F.3d at 1183. An employer, however, must respond to a prima facie case of discrimination by giving a legitimate, non-discriminatory reason why the plaintiff was *actually* rejected or passed over in favor of another applicant. It is not sufficient for the employer merely to offer "some *hypothetical* nondiscriminatory reason . . . submit[ted] after the fact." *Cuddy v. Carmen*, 762 F.2d 119, 127 (D.C. Cir. 1985) (emphasis in original). As the Court of Appeals has explained, "[a]llowing an employer to meet its *McDonnell* [*Douglas*] burden by testifying to possible legitimate reasons for employment decisions, whether or not those reasons were the *actual* motivation behind the decisions, would clearly circumvent [the] purpose" of "enabl[ing] the plaintiff to effectively try to show pretext." *Id.* at 127 n.12 (emphasis added). The relevant question is whether the employer's actual reason was legitimate and non-discriminatory—not whether the employer can articulate a "post-hoc rationale" that would have been legitimate and

non-discriminatory.  *Newsom v. Barnhart*, 116 Fed. Appx. 429, 434 (4th Cir. 2004); *see also*

*Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc.*, 690 F.2d 88, 96-97 (6th Cir. 1982)

("[T]he reason articulated by the employer . . . does not meet the required *Burdine* standard

because it was not substantiated by clear, reasonably specific and legally sufficient evidence. . . .

While we agree that such a reason *could* constitute a legitimate reason [for refusing to rehire

plaintiff], no evidence was introduced at trial to demonstrate that it was the reason given by [the

employer] for its refusal to rehire [plaintiff].") (emphasis in original).

Thus, for present purposes, the question is not whether Plaintiff was as qualified, or more

qualified, than the two candidates who were offered the first Investigation Evaluator position.

There is no evidence in the record that Parker based his decision on a comparison of the

candidates' qualifications, and there is no evidence that Plaintiff's relative lack of qualifications

formed the actual basis for the FHFA's decision.  A decision by an agency, for example, to hire

by drawing lots might be non-discriminatory, but it would be no answer in a discrimination suit

that the lucky applicant, whose lot was drawn, was deemed in retrospect to have been more

qualified than the other applicants.

The Court recognizes that the FHFA might be able to identify a legitimate, non-

discriminatory reason for the decisions it made.  But the Agency must rely on its actual rationale,

which is not currently developed in the record.  If Plaintiff's application was weighed against the

applications of other applicants, the Agency should say so, or, if the Agency made its decision

based on some other method, it should identify that rationale.  For present purposes, the Court

merely concludes that the Agency has, on this record, failed to meet its burden of articulating a

legitimate, non-discriminatory reason for offering the first Investigative Evaluator position to

two other applicants, but not Plaintiff, based on their comparative qualifications.

2.   *The Lack of Time and Resources Rationale*

As to both the first and second Investigative Evaluator positions, the FHFA also contends that it simply lacked the time and resources to fill the positions and that this explanation, standing alone, constitutes a legitimate, non-discriminatory reason for its failure to interview or hire Plaintiff, even if he were otherwise qualified.  *See* Dkt. 6-2 at 16; Dkt. 11 at 4.  As to this rationale, there is substantial, uncontested evidence in the record that Parker, who was responsible for filling the two positions, became overwhelmed with other, more pressing tasks and that, for this reason, he never got around to completing the hiring process.

Parker has explained that he did not have time to finish hiring for the positions because "[a]n increasingly significant portion of my work in spring of 2011 was dedicated to supporting the production of the Agency's inaugural [semiannual report]." *See* Dkt. 6-4 at 13 ¶ 25 (Parker Decl.); *see also id.* ("This work was especially heavy in May 2011, since we were shooting to publish the [report] by the end of that month."); *id.* at 10 ¶ 10 ("as the Agency approached its late May 2011 publishing deadline . . . there weren't enough hours in the day to accomplish everything that needed to be done").  After his tentative selections for the first Investigative Evaluator position did not work out, *id.* at 11-12 ¶¶ 17-20, Parker asserts, his "attention had shifted by necessity to completing work on" the semiannual report and other on-going projects, *id.* at 12 ¶ 18.  According to Parker, no formal decision was made to leave the positions unfilled, but the task of filling them "was simply overcome by events." *Id.* at 12 ¶ 19, 13 ¶ 26.

Plaintiff argues that Parker's account is controverted by a single piece of evidence—an April 29, 2011, "[m]essage from the [FHFA] Inspector General" that serves as an introduction to the semiannual report.  *See* Dkt. 8-1 at 15.  Based on the date of this message, Plaintiff contends that "the semiannual report was actually submitted in April 2011," Dkt. 1 at ¶ 6, and that its

preparation did not extend until late May, as Parker asserts, Dkt. 6-4 at 14 ¶ 28.  Plaintiff argues

that "Mr. Parker could not have been 'consumed' with the production of the [semiannual report]

until late May because it was **completed** on April 29, 2011." Dkt. 12 at 2 (emphasis in original).

The undisputed record, however, does not support Plaintiff's contention that all the work

on the semiannual report was done by May, much less that the report was "already submitted" by

May.[4]  According to Parker's declaration, submitted under the penalty of perjury, the report was

"published" on May 26, 2011.  *See* Dkt. 6-4 at 14 ¶ 28.  The Agency has also submitted

documentary evidence that the published Report was, in fact, sent to Congress on that date, *see*

Dkt. 11-2 (May 26, 2011, cover letters from Inspector General Linick to members of Congress

"present[ing] the attached Inaugural Semiannual Report"; May 26, 2011, email messages from

FHFA-OIG staff to congressional staff, indicating that a hard copy of the report had been sent to

their offices).  In response, Plaintiff retreats from his initial allegation that the report was

"submitted" in April, arguing instead that it is "wholly irrelevant" when the report was

"**transmitted** to some members of Congress," *see* Dkt. 12 at 2 (emphasis in original).  This

argument is unpersuasive because it again assumes, without record support, that Parker could not

have been occupied preparing the report for transmission to Congress.

Plaintiff also argues that the Inspector General Act of 1978 requires semiannual reports to

be "furnished to the head of the [office] not later than April 30" and "transmitted by such head to

the appropriate committees or subcommittees of the Congress within thirty days after receipt of

the report."  Dkt. 12 at 2-3 (emphases omitted).  He does not explain, however, how this

---

[4]  The semiannual report does not appear to specify a date of publication or submission to
Congress.  *See FHFA-OIG Inaugural Semiannual Report to Congress, October 12, 2010,
through March 31, 2011*,
http://fhfaoig.gov/Content/Files/inaugural%20semiannual%20report.pdf (last visited Aug. 28,
2015).

information contradicts Parker's account.  A copy of the semiannual report could have been furnished to the head of the office on April 29, and Parker and others could then have prepared the report for transmission to Congress less than thirty days later, on May 26.  In any event, to the extent Plaintiff is arguing that the FHFA failed to comply with the requirements of the Inspector General Act, *see* Dkt. 8 at 2, such a failure is not indicative of discrimination.  No reasonable jury could infer from this evidence that Parker gave a false account of his activities during May 2011 as a pretext for discriminating against Plaintiff.

It is also unclear how Plaintiff's challenge to Parker's explanation advances his position.  The Parker declaration asserts that "hundreds of applications" were received for the first position, Dkt. 6-4 at 11 ¶ 14, and that "many" were received for the second position, *id.* at 13 ¶ 23.  He also asserts that he interviewed three candidates for the first position, and none for the second.  *See* Dkt. 6-7 at 6, 11.  Although in some circumstances, an employer's decision not to fill a position with a qualified candidate from a protected class might support a claim of discrimination, *see, e.g.*, *Terry v. Gallegos*, 926 F. Supp. 679, 710 (W.D. Tenn. 1996) (holding that employer's reasons for canceling vacancies were pretextual); *Carter v. Pena*, 14 F. Supp. 2d 1, 7 (D.D.C. 1997) (granting summary judgment to employer where no evidence indicated that it had "canceled vacancies with the specific intent to discriminate against [plaintiff]"), the Court does not understand Plaintiff to argue—nor could he plausibly do so—that the FHFA decided to put aside hundreds of applications and not to fill either of the two Investigative Evaluator positions merely to avoid having to offer a position to Plaintiff.

Consideration of the FHFA's contention that it was too busy to fill the Investigative Evaluator positions, however, leads to different conclusions with respect to the two positions.  As to the first position, the Agency cannot escape the fact that Parker found time to interview

three applicants and offer positions to two of them.  Plaintiff was not one of the applicants who was offered a position, and he has alleged that but-for the FHFA's discriminatory treatment, he would have received one of those offers.  The Agency may well be able to rebut this argument, but the fact that Parker *later* became busy is no answer.

With respect to the second Investigative Evaluator position, the result is different.  Parker never interviewed any applicants and never offered the position to anyone.  Instead, as he explains without plausible contradiction, he simply became too busy to complete the hiring process.  That is, standing alone, a legitimate, non-discriminatory reason for the Agency's failure to interview or hire Plaintiff—no one was interviewed or hired because other tasks were more pressing.  The Court, accordingly, concludes that as to the second Investigative Evaluator position, the FHFA has carried its burden of production under the *McDonnell Douglas* framework.  At this point, the burden shifts back to Plaintiff to present evidence that the Agency's time and resources rationale is pretextual.

For the reasons explained above, the Court concludes that Plaintiff has failed to identify any evidence calling into question Parker's testimony that he was busy working on the semiannual report to Congress through late May.  *See* Dkt. 6-4 at 10-14.  Plaintiff also alleges that the various FHFA affidavits submitted in the administrative proceeding are not credible because they contain various "inconsistent statements."  *See* Dkt. 1 ¶ 6.  He asserts, for example, that one affidavit describes a hiring official's failure to remember a vacancy announcement, followed by a statement that he was aware of the qualifications of the applicant hired for the position advertised in that vacancy.  Plaintiff did not attach copies of all the purportedly inconsistent statements to his filings; he only paraphrases them or provides brief, out-of-context quotations.  As already noted, Plaintiff's argument that FHFA officials falsely claimed to be

ignorant of the applicants' ages fails because the cited statements are not inconsistent with the

officials having a "basic impression" of the applicants' ages.  *See* Dkt. 6-5 at 18-19, 21

(Emerzian Aff.).  To the extent the Court can identify the other statements to which Plaintiff

refers, the Court does not agree that they are inconsistent, much less sufficient to support an

inference of discrimination.  *Cf. Hairston*, 773 F.3d at 272 (an employer's failure to recall a

conversation about an applicant "does not, on its own, create a genuine issue of material fact").

Finally, Plaintiff argues that the Equal Employment Opportunity ("EEO") counselor told

him, incorrectly, that all available positions had been filled.  Dkt. 1 ¶ 6.  But Plaintiff does not

explain how the EEO counselor's misstatement could impugn or undermine the Agency's

explanation of its hiring decisions.  Rather, Plaintiff argues that the misstatement constituted "a

dishonest attempt to discourage him from filing a formal complaint."  Dkt. 12 at 5.  That

contention, however, does not speak to the merits of his complaint.  Finally, even putting this

aside, Plaintiff fails to address how the EEO counselor's purported misstatement has caused him

any harm, since he has, in fact, filed suit.

Accordingly, the Court denies the FHFA's motion for summary judgment with respect to

the first Investigative Evaluator position because it has failed to provide a legitimate, non-

discriminatory reason for why it *actually* interviewed and selected two individuals instead of

Plaintiff.  With respect to the second Investigative Evaluator position, however, the Court grants

the FHFA's motion for summary judgment because it has provided a legitimate, non-

discriminatory reason for failing to fill that position, and Plaintiff has failed to point to evidence

sufficient for a rational factfinder to conclude that the Agency's explanation was a pretext for

discrimination.

**C.  Plaintiff's Additional Arguments**

The complaint also alleges that "FHFA OIG used a scheme" involving direct-hire

authority "to avoid hiring older qualified veterans," Dkt. 1 ¶ 6, and Plaintiff argues in his briefs

that the agency discriminated against him as an "older qualified veteran" or a "disabled veteran,"

*see, e.g.*, Dkt. 8 at 3 ("Defendant's admission of failure to consider Plaintiff's years of service

and experience is a prima facie case of age discrimination by the Defendant against a qualified

older veteran.").  To the extent Plaintiff is attempting to press another kind of claim, in addition

to his failure-to-hire claim under the ADEA, the Court concludes that he fails adequately to plead

that claim.  *See Belton v. Shinseki*, 637 F. Supp. 2d 20, 23 (D.D.C. 2009) ("[A] *pro se* complaint,

no less than any other complaint, must present a claim on which the Court can grant relief.")

(quotation marks omitted).

The FHFA understands Plaintiff to allege either a "pattern and practice claim" or "a

disparate impact theory of age discrimination," *see* Dkt. 6-2 at 20-21, and argues that either way,

the allegations lack sufficient factual support.  For the reasons discussed above, the FHFA is

entitled to summary judgment on Plaintiff's pattern and practice challenge to three of the four

positions at issue.  The Court agrees with the Agency, moreover, that Plaintiff has not alleged a

disparate impact claim.  "In order to establish disparate-impact discrimination, Plaintiff must

show that a facially neutral employment policy or practice has a significant disparate impact on a

protected class of which he is a member."  *Jianqing Wu v. Special Counsel*, 54 F. Supp. 3d 48,

54 (D.D.C. 2014).[5]  To state an age discrimination claim based on a disparate impact theory,

---

[5]  "Plaintiffs alleging age discrimination in violation of the ADEA may seek recovery under both disparate treatment and disparate impact theories of recovery."  *Aliotta v. Bair*, 614 F.3d 556, 561 (D.C. Cir. 2010) (citing *Smith v. City of Jackson*, 544 U.S. 228, 236-40 (2005)).  Although the Court of Appeals has previously expressed uncertainty whether a disparate impact ADEA

"[c]ommon sense and fairness . . . dictate that [the plaintiff] must, at a minimum, allege some statistical disparity, however elementary, in order for the defense to have any sense of the nature and scope of the allegation." *Id.* (quotation marks omitted). In both disparate impact cases and pattern or practice cases, "where liability depends on a challenge to systemic employment practices[,] courts have required finely tuned statistical evidence, normally demanding a comparison of the employer's relevant workforce with the qualified populations in the relevant labor market." *Krodel v. Young*, 748 F.2d 701, 709 (D.C. Cir. 1984).

Although the complaint alleges that the FHFA-OIG systematically discriminates against older veterans, it does not support that statement with any factual allegations or evidence. The complaint does not give any details about the number of older veterans hired by the office, nor does it identify any hiring disparities. It does allege, without any factual support, that the FHFA-OIG sought and obtained direct-hire authority from OPM in order to avoid complying with the Merit Systems Protection Board's decision in *Isabella v. Dep't of State*, 109 M.S.P.R. 453 (M.S.P.B. 2008), *see* Dkt. 1 ¶ 6, which held that agencies are obligated to waive non-essential age restrictions for eligible veterans, *see Isabella*, 109 M.S.P.R. at 458-461. Standing alone, that is not sufficient to plead a disparate impact claim. The Agency, moreover, explains at length that it sought and obtained direct-hire authority because FHFA-OIG was a new, short-staffed office with pressing oversight responsibilities. *See* Dkt. 6-2 at 3-5; Dkt. 6-1 ¶ 14 ("OPM's approval letter observed that 'FHFA-OIG does not have sufficient staff . . . . *there is an immediate need to hire qualified staff more expeditiously than can be done under normal competitive hiring rules*'") (emphasis in original). Plaintiff fails to respond to the Agency's explanation and evidence.

---

claim is available against *federal* employers, *see id.* at 561 n.4, the Agency does not make that argument and the Court need not reach it.

Thus, to the extent Plaintiff is attempting to bring a claim based on a disparate impact on older veterans, the complaint fails adequately to plead such a claim and Plaintiff has also failed to identify any dispute of fact.

To the extent Plaintiff is arguing that the FHFA violated its statutory obligations by "fail[ing] to consider Plaintiff's years of service and experience" during the hiring process, *see* Dkt. 8 at 3, he likewise fails to state a claim. The ADEA does not require agencies to give special consideration to older applicants' service and experience; it only prevents discrimination on the basis of age. To be sure, some statutes and regulations do require agencies to give certain advantages to eligible veterans. *See Lazaro v. Dep't of Veterans Affairs*, 666 F.3d 1316, 1318 (Fed. Cir. 2012) ("One of the advantages received by preference eligible veterans is that an agency must comply with special statutes and regulations when it determines whether a veteran is qualified for a given position."); 5 U.S.C. §§ 2108, 3309.[6] But the complaint does not allege a claim based on those statutes or regulations, and Plaintiff does not appear to have raised or exhausted any such claims in an appropriate administrative proceeding.[7]

For these reasons, the Court concludes that Plaintiff's allegations and arguments relating to his status as a veteran do not create any new issue of material fact with respect to his ADEA claim, which is the only claim alleged in the complaint.

---

[6] *See also* Veterans Services, Office of Personnel Mgmt., http://www.opm.gov/policy-data-oversight/veterans-services/vet-guide (last visited Aug. 28, 2015).

[7] *See generally* 5 U.S.C. §§ 3330a(a)(1)(A) & 3330b(a)-(b); 5 C.F.R. § 1201.3(a)-(c); 29 C.F.R. § 1614.302.

**CONCLUSION**

For the reasons stated above, it is

**ORDERED** that Plaintiff's motions for leave to file surreplies (Dkts. 12, 13) are **GRANTED**; it is further

**ORDERED** that Defendant's motion for summary judgment (Dkt. 6) is **GRANTED** with respect to Plaintiff's discrimination claims based on the two Special Agent positions and the second Investigative Evaluator position; it is further

**ORDERED** that Defendant's motion for summary judgment is **DENIED** with respect to Plaintiff's discrimination claim based on the first Investigative Evaluator position; and it is further

**ORDERED** that to the extent Plaintiff attempts to rely on a disparate impact theory, that claim is **DISMISSED** for failure to state a claim.

It is **SO ORDERED.**

                                             /s/ Randolph D. Moss
                                             RANDOLPH D. MOSS
Date:  August 31, 2015                       United States District Judge